

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

———————————————

No. 02-24-00199-CV

———————————————

IN THE INTEREST OF A.M., A CHILD

---

On Appeal from the 367th District Court
Denton County, Texas
Trial Court No. 22-10188-393

---

Before Sudderth, C.J.; Kerr and Bassel, JJ.
Memorandum Opinion by Justice Bassel

## MEMORANDUM OPINION

## I. Introduction

This is an ultra-accelerated appeal[1] in which Appellant L.M. (Mother) appeals the termination of her parental rights to her son A.M. (Aaron)[2] following a three-day jury trial.[3] The jury found by clear and convincing evidence that Mother had (1) knowingly placed or knowingly allowed Aaron to remain in conditions or surroundings that endangered his physical or emotional well-being, (2) engaged in conduct or knowingly placed Aaron with persons who had engaged in conduct that endangered his physical or emotional well-being, and (3) failed to comply with her court-ordered service plan. *See* Tex. Fam. Code Ann. § 161.001(b)(1)(D), (E), (O). The jury also found that termination of the parent–child relationship between Mother and Aaron was in his best interest. *See id.* § 161.001(b)(2). The trial court signed an

---

[1]*See* Tex. R. Jud. Admin. 6.2(a) (requiring appellate court to dispose of appeal from a judgment terminating parental rights, so far as reasonably possible, within 180 days after notice of appeal is filed).

[2]*See* Tex. R. App. P. 9.8(b)(2) (requiring court to use aliases to refer to minors in an appeal from a judgment terminating parental rights).

[3]The trial was originally set for November 21, 2023, but on that date, concerns were raised regarding Mother's ability to read and understand instructions. Thereafter, the case's dismissal deadline was extended, and the trial was set for April 22, 2024, and commenced on that date.

order of termination nunc pro tunc[4] terminating Mother's parental rights based on clear and convincing evidence of the three predicate grounds—endangering environment, endangering conduct, and failure to comply with her court-ordered service plan—and the best-interest ground. *See id.* § 161.001(b)(1)(D), (E), (O), (b)(2).

In six issues, Mother challenges whether the trial court lost jurisdiction due to a typographical error in the order extending the case's dismissal deadline and whether sufficient evidence supports the predicate and best-interest findings. Because the trial court signed the extension order prior to the dismissal deadline and because the termination trial commenced prior to the extended dismissal deadline, the trial court did not lose jurisdiction. Furthermore, because sufficient evidence supports the endangering-conduct and best-interest findings, we affirm.

## II. Background Facts

### A. Overview

Although Aaron is Mother's fifth child, none of her children live with her. This is due in part to her prior CPS history; her drug use; her criminal history; and her failure to cease her relationship with a man named Steve, who domineered Mother's life and repeatedly abused her. Because we review the endangering-conduct ground in our analysis of the challenged predicate-ground findings, we focus the factual

---

[4]The trial court signed a nunc pro tunc order because the initial termination order inadvertently omitted language that the Court-Appointed Special Advocate (CASA) would continue as Aaron's guardian ad litem.

3

background on evidence of endangerment, as well as on evidence that is relevant to the challenged best-interest finding.

## B.     Mother's Unsafe Relationship with Steve

Mother and Steve began a common-law marriage when she was nineteen. Mother testified that Steve has a problem with alcohol and drugs, and the record further revealed that he had "some assault charges."

While she was pregnant at Thanksgiving in 2013, Steve choked her and kicked her stomach to try to make her lose the baby.[5] Steve continued to "pac[e] over" Mother until he passed out from alcohol. At that point, Mother ran for help. But afterwards, Mother decided to continue her relationship with Steve.

## C.     Prior CPS History

The record revealed that Mother and Steve had ten prior CPS cases dating back to 2012; those cases involved sexual abuse, drug use, and domestic violence. Mother had two prior children removed due to drug use and a criminal matter in which she was named as an accomplice to Steve's sexual trafficking of his minor daughter and for which Mother was convicted of interference with child custody.

## D.     Aaron's Birth and Removal During Lengthy Hospital Stay

Shortly after Mother was in a car accident in October 2022, Aaron was born at thirty weeks' gestation. At Aaron's birth, he and Mother both tested positive for

---

[5]It is not clear which of her four older children she was pregnant with at that time.

barbiturates,[6] and his meconium tested positive for marijuana. Hospital personnel had concerns regarding Mother's safety (due to evident bruises and a black eye that she did not explain[7]) and whether she had undergone prenatal care.

Although Steve came to the hospital, Mother claimed that he was not Aaron's father.[8] She said that she had no contact information for Aaron's father because he was conceived during a one-night stand while she was on vacation in Florida.

Due to Aaron's prematurity, he had episodes of apnea and issues with sustaining a normal heart rhythm and was in the hospital for over two months. Aaron had his own room in the hospital where Mother could have stayed overnight, but she never did so. Mother spent five minutes with Aaron two days after he was born; she agreed at trial that was not enough time to spend with her premature baby. The hospital records demonstrate that during November (the month following the birth), Mother went twelve days in a row without visiting Aaron. Mother did not attend the developmental therapy sessions at the hospital where she could have learned how to care for him, nor did she send anyone to go in her place.

---

[6]Barbiturate use was not the focus of the trial because evidence showed that Mother was given a medication during delivery that could have possibly prompted a positive result.

[7]At trial, she claimed that she did not recall having any bruises and that she had pink eye.

[8]During the investigation of the car accident, Steve (who was in the car with Mother) had told police that she was his fiancée, and the following day, he described her as his wife. At trial, Mother said that she was unaware of this and did not know why he had said that.

Mother was aware that the hospital was really concerned because she was not coming to the hospital to see Aaron but instead was calling only occasionally to check on him; Mother claimed that she did not feel well. On the infrequent occasions when Mother did come to the hospital to see Aaron, she came at odd hours (sometimes after midnight) when there was no therapy for her to attend.

Mother admitted that she argued with Steve on the phone at the hospital and that she argued with him a lot. Steve was very controlling of any conversation that the Department attempted to have with Mother, and she would not speak to the Department without his being included on the phone call. Hospital personnel presented to the Department their concerns that Mother was being sex trafficked.

The Department made the decision to remove Aaron from Mother's care around Thanksgiving 2022.[9] He remained in the hospital until December 27, 2022.

### E. Mother's Service Plan

To obtain Aaron's return to her care, Mother was ordered to complete a service plan. Mother's service plan required her to submit to random drug-and-alcohol testing; to undergo a psychological evaluation and a psychosocial evaluation; to attend counseling and parenting classes; to undergo drug and alcohol assessments; to complete domestic-violence intervention services; to maintain safe and stable housing and suitable employment; and to refrain from engaging in criminal activity, using

---

[9]Shortly thereafter, Steve signed an "Affidavit of Waiver of Interest" of any rights to Aaron, and his rights and any interest to Aaron were terminated on the first day of trial. The trial court also terminated Unknown Father's parental rights.

illegal substances, and consuming alcohol. Although Mother completed many of the classes and evaluations on her service plan, she struggled to submit to random drug testing, to maintain stable housing, and to refrain from consuming alcohol.

### 1. Drug Testing

Mother admitted having missed "quite a bit of drug testing." The one test result that was admitted at trial was a November 30, 2022 hair-strand test that was positive for marijuana.

### 2. Safety and Stability of the Home

Mother admitted that she had moved about every three to four months while the case was pending. She said that Steve had helped her move each time.

### 3. Intoxication

Officer Niko Bookman with the Denton Police Department testified that he responded to a disturbance at the Waffle House at 2:30 a.m. on March 25, 2023. Steve was there and identified Mother as his wife. Mother said that they had argued, but after Steve got really aggressive and questioned why she had said that they had argued, Mother denied her statement. Officer Bookman said that both Steve and Mother showed signs of intoxication. Officer Bookman arrested Steve for public intoxication. When Officer Bookman placed Steve in the patrol car, he tried to kick out the window. Once in the "drunk tank" at the jail, Steve attempted to punch the glass window and yelled the entire time. Officer Bookman said that he would be concerned for the safety of any female with Steve because he was aggressive and

7

controlling. Based on Officer Bookman's interactions with Steve, Officer Bookman opined that a one-year-old child would not be safe around Steve.

Officer Austin Thompson with The Colony Police Department responded to a call in the predawn hours on September 5, 2023. The clerk of the Fast Fuels gas station reported that a vehicle arrived carrying three people—two females and a male—and that they appeared to be intoxicated; the male was yelling, screaming, cussing, and kicking the car. Officer Thompson spoke with the driver, Steve, and concluded that he and the female passengers were intoxicated. Steve identified the passenger in the front seat (Mother) as his wife[10] and stated that she might be pregnant. Officer Thompson arrested Steve for driving while intoxicated.

### F. Domestic Violence Continued

Officer Joel Manes with the Denton Police Department testified that he responded to a disturbance at 4:30 a.m. on May 1, 2023. A neighbor had reported that a male was assaulting a female. The female was Mother, and she told Officer Manes that Steve (whom she described as her ex) had been drinking, that he had become upset and had gotten violent, that he had hit her an unknown number of times, that he had pulled her hair, and that he had taken her phone from her. Mother had red marks on her face above and next to her left eye. Mother said that the pain was an eight or a nine out of ten, but she refused medical care. Mother also declined Officer Manes's help to call Friends of the Family so that she could "exit that

---

[10]Mother told another responding officer that Steve was "an old friend."

8

scenario." Based on what Officer Manes witnessed, he did not believe that Mother would be able to protect herself or anyone else from Steve.

Officer William Hulslander with the Denton Police Department testified about a disturbance call to which he responded on July 30, 2023. When he arrived, Mother told him that Steve (whom she referred to as her estranged husband) had come in through her window. Mother said that she was uncomfortable with Steve's[11] staying in her bed and that she had called the police to stop him from coming back and sneaking into her bed the next night. Mother discussed this incident during her trial testimony and acknowledged that this would be a dangerous environment for Aaron.

Officer Manes also responded to a call that involved Mother on December 9, 2023. When Officer Manes arrived, Mother said that two of Steve's grown daughters had come to her home; when Mother had opened the door, one of his daughters grabbed her by the hair, knocked her to the ground, hit her in the head at least ten times, and possibly kicked her. Mother accepted transportation to the hospital because she was pregnant.[12] Officer Manes stated that he was concerned about "a cycle of potential violence that's threatening [Mother's] safety within that family."

Another officer who responded to the call, Officer Lauren Seeley, testified that the dispatch system contains warnings about Steve—that he is gang affiliated, is

---

[11]The Department did not learn about the incident until "way later," and Mother denied that the intruder was Steve.

[12]Mother had not told the Department that she was pregnant and later said that she did not know who had gotten her pregnant.

hostile toward the police, has a criminal-trespass warning, and is an evading risk. Officer Seeley was also aware of Steve's assault of Mother in May 2023 and was concerned that there was a continuing cycle of violence in the family. Officer Seeley agreed that a small child would be in danger in an environment with domestic violence "such as here."

### G. Mother's Continued Relationship with Steve

At the termination trial in April 2024, Mother claimed that Steve was no longer violent toward her and that she no longer had a romantic relationship with him. Mother admitted that it looked like she was telling different stories by telling the Department that she had no communication with Steve when during that same time (even during the month of the termination trial), he was posting on social media about her new furniture and new carpet. Mother said that she could not control Steve (e.g., his videoing her new carpet in her private residence) and admitted that he is a bad person. Mother agreed that she always goes back to Steve because he always tells her that "he [is] going to fix it[ and that] it won't be like that anymore." Mother admitted she had told a caseworker on September 11, 2023, that she was not going to choose a man over her baby but that she had not stayed true to her word.

Mother said that she knows that it looks bad and that she made some bad choices (i.e., reconciling with Steve when he had a drinking problem and an "assaulting problem"), but she does not "want to make the same mistakes anymore." Mother agreed that it was impossible to believe that she was only planning to have

10

Steve involved in her life as a friend. Mother admitted that Steve was at her house every week.

When Mother was asked why she was not running for the hills to try to get away from Steve's family, she replied, "I want to." But she agreed that she had not done so[13] and that Aaron was at risk. She also agreed that due to her involvement with Steve, it would be a dangerous situation if Aaron were returned to her.

## H.    Effect of Mother's Cognitive Disabilities on Her Parenting Ability

Mother left school at approximately ten years old (per her trial testimony) or before tenth grade (what she told her psychologist). During the case, information came to light that Mother allegedly could not read, and testing revealed that she had a low IQ and cognitive disabilities.

Dr. Eboni Butler, a clinical psychologist, performed Mother's psychological evaluations in March 2023 and November 2023 and provided individual counseling to her in the fall of 2023. Dr. Butler was concerned about Mother's level of understanding of the allegations against her and how that level of understanding impacted her ability to care for her son. Mother did not understand why Aaron was not with her or the role that she had played in his removal. Mother said that she could not read, which raised Dr. Butler's concerns about Mother's ability to adequately parent Aaron. The IQ test that Mother underwent in November 2023

---

[13]Mother said that she was willing to get a protective order against Steve but that she had never gone through with it.

revealed that she had an IQ of 60, which Dr. Butler said is considered below average. Dr. Butler diagnosed Mother with mild intellectual disability. Based on Mother's IQ, Dr. Butler opined that Mother would need "sufficient resources in order to effectively raise [a] child" and to protect herself. Dr. Butler had worked with Mother on parenting skills and had concerns about her ability to execute those skills because she appeared to just want to get her services done. Dr. Butler did not know if Mother could meet the bar of what is deemed appropriate parenting.

## I. Conservatorship Workers' Assessments

Three conservatorship workers were assigned to Mother's case during its pendency. They reported similar observations regarding Mother's participation in Aaron's visits and in her services:

- Mother often missed visits or showed up late;[14]

- Mother was usually "glued to [her] phone" for the majority of her visits;

- Mother ended visits early;

- Mother required the conservatorship worker to make Aaron's bottles for many months, despite that this was Mother's fifth child, and she needed help putting Aaron in the bouncer;

- Beginning at thirteen months, Aaron's swallowing issues necessitated that a thickener be added to his bottles, but Mother often forgot and

---

[14]Mother admitted missing a lot of visits. She missed so many visits that the Department required her to provide advance notice and sign in before Aaron would be transported to a visit.

never seemed to understand that he would vomit without the thickener and could later aspirate;[15]

- Mother did not appear to have a bond with Aaron or he with her as he did not get upset when she left at the end of visits;

- Steve drove Mother to many of the visits, and they argued;[16]

- Mother demonstrated a lack of candor about her ongoing violent relationship with Steve;[17]

- The Department offered Mother a resource for an adult literacy program, but Mother declined;

- The Department offered Mother additional domestic-violence services, but Mother declined them;

- The Department wanted Mother to attend a second parenting class or work with a parenting coach to help with her visits, but Mother declined the additional help, saying that she did not think that she needed it;

- Mother did not keep the Department apprised of her addresses, including failing to provide her address until the weekend before the initial November trial date, and failed to provide copies of her leases;

---

[15]Any time Mother failed to add the thickener and Aaron vomited, the conservatorship worker had to alert the foster parents because Aaron had to be monitored the rest of the day and throughout the evening to make sure that he did not aspirate.

[16]On September 11, 2023, an incident occurred in the CPS parking lot between Steve and Mother. Steve was upset with Mother and said, "I will kill you, you f--king dyke." Mother said that was pretty normal. Approximately two weeks later at the permanency hearing, Mother told the trial court that she was reconciling with Steve.

[17]Mother told her current conservatorship worker that she had ended a romantic relationship with Steve in December 2023 and had last seen him in February 2024, despite that she had seen him the week prior to the April trial when he came to her home and showed off her furniture and carpet on his Instagram account.

- Mother refused numerous home visits, and Bud Lite beer was found on her porch;

- When conservatorship workers were able to enter Mother's home, it appeared well kept, and she had food and bedding for a child;

- Mother reported that she had signed up for her GED, that she was participating in Zoom counseling, and that she had completed the advanced domestic-violence course; and

- Mother was not compliant with drug testing throughout the case and failed to show for five requested tests.

### J.     Aaron's Health and Developmental Issues

At the time of trial, Aaron had reflux disease that required medication; had a head tilt that required stretches; aspirated milk, requiring liquids to be thickened and stimulation therapy with electrodes eight times per month; and exhibited delays due to prematurity for which he received occupational therapy. Aaron had a referral for Early Childhood Intervention (ECI) due to his premature birth and was receiving feeding therapy twice a week and occupational therapy three times per month. Aaron (who was eighteen months old at the time of trial) was "getting more confident about . . . going from crawling to cruising" and was a little closer to walking.

### K.     Foster Home

Aaron stayed in the same foster home from the time he was discharged from the hospital to the time of the termination trial. The main conservatorship worker who handled the case from February 2023 to January 2024 described Aaron's foster parents as "amazing" and said that they took turns visiting Aaron at the hospital and

14

spent hours with him each day, learning how to feed and hold him. She described Aaron's bond with his foster parents as loving and secure and said that he is happy when he is around his foster parents. Foster mom and dad also testified that Aaron is bonded to them and to their son. Foster mom and dad said that Aaron is thriving in their home and that they want to adopt him.

### L. CASA Volunteer

Catherine Tripp, the CASA volunteer, testified at trial and echoed much of the conservatorship workers' testimony regarding

- the nurses' concerns about Mother's failure to attend Aaron's feedings since feeding him was "so different than feeding any other baby,"

- how the foster parents visited Aaron regularly while he was in the hospital, "were really providing all of his care," and were participating in any therapy sessions that he had,

- how Mother struggled to prepare Aaron's bottles at the visits and failed to thicken the liquid in his bottles even as recently as a visit in January 2024,

- how "a lot" of Mother's phone calls during visits were "angry" and that this was a concern because Aaron was in the room and was able to hear and witness them,[18]

- how Aaron calls his foster mom "momma" and his foster dad "dada" and that he is "incredibly bonded" to his foster sibling, and

- how there was no bond observed between Mother and Aaron because there was not any engagement (no talking or eye contact from Mother) with

---

[18]Tripp was shocked and a little angry when Mother announced on the initial trial date that she could not read because Tripp had seen Mother read many times—at every visit that she had attended (multiple times during a visit) and at home visits. Mother typed texts and read responses without using voice-to-text software or Siri.

Aaron and because Aaron did not appear excited when he saw Mother at the beginning of a visit and did not get upset at the end when she left.

Tripp, who had observed thirty-one of Mother's visits, added that after Aaron became mobile, Mother was very uncomfortable with his mobility, despite being in a babyproof room at the CPS office. When he crawled or tried to move around the room, she would pick him up and tell him "no." Tripp found this concerning because Aaron was in occupational therapy due to delays in crawling and walking.

Tripp expressed concern that Steve did not seem to allow Mother to have a private phone conversation with the hospital staff or social worker, that Mother denied having a relationship with Steve, that Mother minimized Steve's behavior and rejected help, and that several police reports reflected continuous domestic violence. Tripp said that Steve had been threatening and violent toward everyone he had encountered—Mother, the police, and the medical staff who drew his blood. Mother was unable to protect herself from Steve but had told Tripp that she did not understand why he was a problem. Tripp opined that it would be dangerous for Aaron to be returned to Mother because if Mother does not understand why Steve is a problem, she will not be able to protect Aaron because she does not believe he needs to be protected. Tripp added that "just being around domestic violence is incredibly harmful to a child, particularly a child under the age of 3, which [Aaron] is, because [his] brain is still developing." Tripp noted that "studies have found that witnessing domestic violence . . . has the same effect on those children as adults as

actually being the victim [of] the abuse." Tripp further stated that children who witness domestic violence often have lower IQs, struggle with depression and post-traumatic stress disorder, and become abusers. Tripp testified that many times during the case Mother had said that Steve was a bad person and that she was not going to have him in her life, but she had not ever made that happen.

Tripp opined that Mother cannot meet Aaron's basic needs or provide a safe home. Through Tripp, CASA recommended for Mother's parental rights to Aaron to be terminated to allow him to be adopted by his foster family; Tripp testified that this was in Aaron's best interest.

### M. The Department's Recommendation

The main conservatorship worker[19] opined that if Aaron were returned to Mother, "he would be directly put into that life of violence and chaos without any protection." The conservatorship worker was especially concerned about Mother's trial testimony that she has no control over who comes into her home. The conservatorship worker said that it was hard to advocate for Mother "when she cannot protect herself and has this violence in her life."

After the September 11, 2023 parking lot incident, the conservatorship worker informed Mother that she could not advocate for Aaron's return due to Mother's dishonesty, the pattern of violence, and her continued involvement with Steve. The

---

[19]All references to "the conservatorship worker" in this section refer to Salynda Garcia, who served as the conservatorship worker on the case—from February 2023 to January 2024.

conservatorship worker explained that "would be an awful and dangerous situation to put [Aaron] into."

The conservatorship worker did not believe that Mother could meet Aaron's needs. Mother believed that Aaron would "just get better," but the conservatorship worker testified that Aaron will not get better on his own. The conservatorship worker explained that Aaron needs intervention—to continue his therapies.

On behalf of the Department, the conservatorship worker asked the trial court to terminate Mother's parental rights to Aaron so that he could be adopted. The conservatorship worker explained that Mother had endangered Aaron by failing to show up for his feeding therapy sessions while he was in the hospital, neglecting to give him the proper tools when he was feeding, continuing to be involved with a dangerous man, and subjecting him to drugs while in utero. The conservatorship worker said that Aaron deserves stability and a loving home with people who protect him. The Department believed that adoption was in Aaron's best interest to give him safety and stability.

### N. Outcome

After hearing the evidence, the jury answered "yes" to questions one through four, thus finding by clear and convincing evidence that Mother had (1) knowingly placed or knowingly allowed Aaron to remain in conditions or surroundings that endangered his physical or emotional well-being, (2) engaged in conduct or knowingly placed Aaron with persons who had engaged in conduct that endangered his physical

18

or emotional well-being, and (3) failed to comply with her court-ordered service plan. *See id.* § 161.001(b)(1)(D), (E), (O). The jury also found that termination of the parent–child relationship between Mother and Aaron was in his best interest. *See id.* § 161.001(b)(2). The trial court signed a judgment in accordance with the jury's answers. *See id.* § 161.001(b)(1)(D), (E), (O), (b)(2). Mother filed a motion for new trial, which the trial court heard and denied, and she timely perfected this appeal.

### III. The Trial Court's Jurisdiction

In her first issue, Mother argues that the trial court lost jurisdiction by failing to extend the case's automatic dismissal deadline before its expiration "when one of its extension orders omitted to set the trial date within the 180-day extension." Mother's argument misconstrues the statutory requirements of an extension order.

#### A. Applicable Law

Section 263.401(b) sets forth the requirements for extending a dismissal deadline and for the contents of the extension order:

> (b) Unless the court has commenced the trial on the merits, the court may not retain the suit on the court's docket after [the first Monday after the first anniversary of the date the court rendered a temporary order appointing the Department as temporary managing conservator (hereinafter the initial dismissal deadline)] unless the court finds that extraordinary circumstances necessitate the child['s] remaining in the temporary managing conservatorship of the [D]epartment and that continuing the appointment of the [D]epartment as temporary managing conservator is in the best interest of the child. If the court makes those findings, the court may retain the suit on the court's docket for a period not to exceed 180 days after the [initial dismissal deadline]. If the court retains the suit on the court's docket, the court shall render an order in which the court:

19

(1) schedules the new date on which the suit will be automatically dismissed if the trial on the merits has not commenced, which date must be not later than the 180th day after the time described by Subsection (a);

(2) makes further temporary orders for the safety and welfare of the child as necessary to avoid further delay in resolving the suit; and

(3) sets the trial on the merits on a date not later than the date specified under Subdivision (1).

*Id.* § 263.401(b). In *In re G.X.H.*, the Texas Supreme Court differentiated the portions

of Section 263.401(b) that are jurisdictional from those that are not:

> [W]e conclude that, while a trial court's failure to timely extend the automatic dismissal date before that date passes—through a docket-sheet notation or otherwise—is jurisdictional, claimed defects relating to the other requirements of [Section] 263.401(b) are not. Accordingly, with the exception of a trial court's failure to extend the automatic dismissal date before it passes, complaints regarding the trial court's compliance with the requirements in subsection (b) must be preserved for appellate review.

627 S.W.3d 288, 301 (Tex. 2021).

## B. What the Record Shows

The trial court signed a temporary order appointing the Department as Aaron's

temporary managing conservator on November 28, 2022, making the initial dismissal

deadline December 4, 2023.[20] On December 1, 2023, the trial court signed an agreed

order extending the dismissal date and setting a hearing date as follows:

---

[20]The parties rely on the December 14, 2022 temporary order following the adversary hearing in calculating a dismissal deadline of December 18, 2023. The

**AGREED ORDER EXTENDING DISMISSAL DATE AND SETTING HEARING DATE**

On November 27, 2023, the Court considered Respondent Mother's Motion for Continuance, filed on November 22, 2023, the parties' agreements, and evidence presented and made the following findings:

Pursuant to § 263.401(b), Texas Family Code, the Court finds that this Court has continuing jurisdiction of this suit, that extraordinary circumstances necessitate that child remaining in the temporary managing conservatorship of the Department, and the appointment of the Department as temporary managing conservator continues to be in the best interest of the child, and an extension of the dismissal date should be granted.

IT IS THEREFORE ORDERED, pursuant to § 263.401(b)(1), Texas Family Code, that this suit shall be dismissed on Friday, May 31, 2024, which date is no later than 180 days following the first Monday after the first anniversary of the date this Court rendered an order appointing the Department as temporary managing conservator, unless a final order is rendered by that date. No additional extension under this section will be granted.

Pursuant to § 263.306 of the Texas Family Code, the Court determines that the next permanency hearing is set on January 3, 2024 at 9:00 a.m. in the 393rd Judicial District Court of Denton County, Texas.

Pursuant to § 263.306 of the Texas Family Code, the Court determines that this suit shall be and is hereby set for jury trial April 29, 2023, at 9:00 a.m. in the 393rd Judicial District Court of Denton County, Texas

Docket Call for this suit is set on April 19, 2023, at 8:30 a.m. in the 393rd Judicial District Court of Denton County, Texas.

---

Department, however, obtained temporary managing conservatorship via the trial court's ex parte emergency order on November 28, 2022; thus, the statutory time period started on November 28 because a court "rendered a temporary order appointing the [D]epartment as temporary managing conservator." *See In re Tex. Dep't of Fam. & Protective Servs.*, 210 S.W.3d 609, 612 (Tex. 2006) (orig. proceeding) (op. on reh'g) (citing Tex. Fam. Code Ann. § 263.401(a)).  But no matter which temporary order is used to calculate the dismissal deadline, the deadline was properly extended by the trial court's December 1, 2023 extension order, which preceded both the December 4, 2023 deadline (as calculated from the ex parte emergency order) and the December 18, 2023 deadline (as calculated from the temporary order following the adversary hearing).

An amended notice of final trial,[21] which is file-stamped January 16, 2024, set the final trial for April 22, 2024.

### C.  Analysis

It is obvious from the face of the December 1, 2023 order that it set a new dismissal deadline (May 31, 2024) that was not more than 180 days after December 4, 2023, but that it contains typographical errors as to the year that was used for the docket-call date and the jury-trial date—both set for April 2023.  Based on the typographical error in the jury-trial date, Mother contends that the extension order did not comply with Section 263.401(b) to properly extend the dismissal deadline because trial was not set "*during* the 180-day time period but was set for a time period that had expired."  [Emphasis added.]  Mother's argument is based on wording that is not in the statute.  As set forth above, an extension order is required to "set[] the trial on the merits on a date not later than the date specified under Subdivision (1)." *See* Tex. Fam. Code Ann. § 263.401(b)(3).  This simply means that the trial date in this case could not be set later than the new dismissal deadline of May 31, 2024.  The trial date that was included in the extension order did not run afoul of the statutory requirement.  And although it is not ideal to have typographical errors in an order, the dates supplied in the December 1, 2023 extension order comply with Section 263.401(b)'s requirements, thus extending the dismissal deadline.

---

[21]On January 5, 2024, the case was transferred from the 393rd District Court's docket to the 367th District Court's Docket.  A few days later, a notice of final trial was issued, setting the trial for May 13, 2024.

22

Mother further complains that the amended order that corrected the year of the trial date came too late because it was not signed before the initial dismissal deadline. Because we have held that the December 1, 2023 extension order properly extended the dismissal deadline, the trial court did not lose jurisdiction over the case on the initial dismissal deadline of December 4, 2023, and thus had the power in January 2024 to amend the trial date. As set forth in *G.X.H.*, setting a new trial date is not jurisdictional; therefore, any complaint regarding the initial setting error and its correction after the initial dismissal deadline must be preserved for review. 627 S.W.3d at 300–01. Mother did not do so and thus waived any complaints as to the trial setting. *See id.* (holding that because parents failed to preserve their complaint regarding the timing and form of the order resetting the trial, the complaint was waived).

Furthermore, the trial court commenced the trial on April 22, 2024, which was before the May 31, 2024 dismissal deadline. The trial court thus did not lose jurisdiction. *Cf.* Tex. Fam. Code Ann. § 263.401(c) (stating that if the trial court grants an extension but does not commence the trial on the merits before the dismissal date, the court's jurisdiction over the suit is terminated and the suit is automatically dismissed without a court order).

Accordingly, we overrule Mother's first issue.

## IV.  Sufficient Evidence Supports Endangering-Conduct and Best-Interest Findings

In her third and sixth issues, Mother challenges the endangering-conduct and best-interest findings.  We set forth the burden of proof and the standards of review and then address each of these issues in turn, ultimately holding that sufficient evidence supports both findings.

### A.    Burden of Proof and Standards of Review

For a trial court to terminate a parent–child relationship, the Department must prove two elements by clear and convincing evidence:  (1) that the parent's actions satisfy one ground listed in Family Code Section 161.001(b)(1); and (2) that termination is in the child's best interest.  *Id.* § 161.001(b); *In re Z.N.*, 602 S.W.3d 541, 545 (Tex. 2020).  Evidence is clear and convincing if it "will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established."  Tex. Fam. Code Ann. § 101.007; *Z.N.*, 602 S.W.3d at 545.

To determine whether the evidence is legally sufficient in parental-termination cases, we look at all the evidence in the light most favorable to the challenged finding to determine whether a reasonable factfinder could form a firm belief or conviction that the finding is true.  *Z.N.*, 602 S.W.3d at 545.  The factfinder may draw inferences, but they must be reasonable and logical.  *Id.*  We assume that the factfinder settled any evidentiary conflicts in favor of its finding if a reasonable factfinder could have done so.  *Id.*  We disregard all evidence that a reasonable factfinder could have disbelieved,

and we consider undisputed evidence even if it is contrary to the finding. *Id.*; *In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002). That is, we consider evidence favorable to the finding if a reasonable factfinder could, and we disregard contrary evidence unless a reasonable factfinder could not. *In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005). The factfinder is the sole judge of the witnesses' credibility and demeanor. *In re J.O.A.*, 283 S.W.3d 336, 346 (Tex. 2009). Moreover, evidence is not legally insufficient merely due to inconsistencies or disputes in the evidence, and "a holistic review of the evidence" should be performed. *In re C.E.*, 687 S.W.3d 304, 309 (Tex. 2024).

We must perform "an exacting review of the entire record" in determining the factual sufficiency of the evidence supporting the termination of a parent–child relationship. *In re A.B.*, 437 S.W.3d 498, 500 (Tex. 2014). Nevertheless, we give due deference to the factfinder's findings and do not supplant the judgment with our own. *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006). We review the whole record to decide whether a factfinder could reasonably form a firm conviction or belief that the Department proved that Mother's conduct endangered Aaron[22] and that the

---

[22]Subsection (M) allows a trial court to terminate the parental rights of a parent whose parent–child relationship with another child was terminated based on an endangerment finding under (D) or (E) (or an out-of-state-equivalent). Tex. Fam. Code Ann. § 161.001(b)(1)(M); *see id.* § 161.001(b)(1)(D), (E). So when a parent challenges a Subsection (D) or (E) finding, due process and due course of law demand that we address the finding and detail our analysis. *In re N.G.*, 577 S.W.3d 230, 235, 237 (Tex. 2019); *see also In re C.W.*, 586 S.W.3d 405, 407 (Tex. 2019) (relying on *N.G.* and holding same). But we need not address both (D) and (E) findings if there is sufficient evidence of one. *See generally* Tex. Fam. Code Ann. § 161.001(b) (requiring proof of only one predicate ground plus best interest to terminate parental rights).

25

termination of the parent–child relationship would be in his best interest. *See* Tex. Fam. Code Ann. § 161.001(b)(1)(E), (2); *In re C.H.*, 89 S.W.3d 17, 28 (Tex. 2002). If the factfinder reasonably could form such a firm conviction or belief, then the evidence is factually sufficient. *C.H.*, 89 S.W.3d at 18–19.

## B. Endangering-Conduct Finding

In her third issue, Mother argues that the evidence is legally and factually insufficient to support the jury's endangering-conduct finding. Applying the standards of review set forth above, we hold that both legally and factually sufficient evidence supports the endangering-conduct finding.

### 1. The Law on Conduct-Based Endangerment

Subsection (E) requires a finding that the parent engaged in conduct or knowingly placed the child with persons who engaged in conduct that endangered the physical or emotional well-being of the child. Tex. Fam. Code Ann. § 161.001(b)(1)(E). To "'endanger' means to expose to loss or injury[,] to jeopardize." *Tex. Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987); *In re A.O.*, No. 02-21-00376-CV, 2022 WL 1257384, at *8 (Tex. App.—Fort Worth Apr. 28, 2022, pet. denied) (mem. op.).

Conduct-based endangerment under Subsection (E) requires more than a "single act or omission"; it requires a "voluntary, deliberate, and conscious course of conduct." *In re R.H.*, No. 02-20-00396-CV, 2021 WL 2006038, at *13 (Tex. App.—Fort Worth May 20, 2021, no pet.) (mem. op.). As a course of conduct,

endangerment under Subsection (E) "is not limited to actions directed towards the child," *In re J.F.-G.*, 627 S.W.3d 304, 315 n.43 (Tex. 2021) (quoting *J.O.A.*, 283 S.W.3d at 345), and may include "actions before the child's birth, actions while the child is not in the parent's presence, and actions while the child is in the Department's custody." *See In re C.Y.*, No. 02-21-00261-CV, 2022 WL 500028, at *2 (Tex. App.—Fort Worth Feb. 18, 2022, pet. denied) (mem. op.). It is not necessary to establish that a parent intended to endanger a child to support termination under Subsection (E). *See In re M.C.*, 917 S.W.2d 268, 270 (Tex. 1996) (per curiam). Nor is it necessary to establish that the parent's conduct caused actual harm; rather, it is sufficient if the parent's conduct endangers the child's well-being. *In re R.R.A.*, 687 S.W.3d 269, 277–78 (Tex. 2024).

> As we have previously noted,
>
> As a general rule, conduct that subjects a child to a life of uncertainty and instability endangers the child's physical and emotional well-being. *See* [*In re*] *S.D.*, 980 S.W.2d [758,] 763[ (Tex. App.—San Antonio 1998, pet. denied)]. A factfinder may infer from past conduct endangering the well-being of the child that similar conduct will recur if the child is returned to the parent. *In re M.M.*, No. 02-08-00029-CV, 2008 WL 5195353, at *6 (Tex. App.—Fort Worth Dec. 11, 2008, no pet.) (mem. op.).

*In re M.B.*, No. 02-15-00128-CV, 2015 WL 4380868, at *12 (Tex. App.—Fort Worth July 16, 2015, no pet.) (mem. op.).

We catalog some of the types of conduct that can be considered in an endangering-conduct analysis:

- Illegal drug use during pregnancy can support a charge that the mother has engaged in conduct that endangers the physical and emotional welfare of the child. *In re M.L.B.*, 269 S.W.3d 757, 760 (Tex. App.—Beaumont 2008, no pet.).

- Also as part of the endangering-conduct analysis, a court may consider a parent's failure to complete a service plan. *See In re R.F.*, 115 S.W.3d 804, 811 (Tex. App.—Dallas 2003, no pet.).

- "A parent's mental health is frequently considered in reviewing the sufficiency of the evidence under endangerment grounds." *In re J.P.-L.*, 592 S.W.3d 559, 583 n.26 (Tex. App.—Fort Worth 2019, pet. denied).

- Further, a parent's lack of significant contact with a child may also endanger the child's physical or emotional well-being. *In re A.J.D.*, No. 02-13-00183-CV, 2013 WL 5781478, at *4 (Tex. App.—Fort Worth Oct. 24, 2013, no pet.) (mem. op.).

Moreover, "evidence of improved conduct, especially of short[ ]duration, does not conclusively negate the probative value of a long history of drug use and irresponsible choices." *J.O.A.*, 283 S.W.3d at 346.

### 2. Analysis

Mother makes five arguments within her third issue, and we address each in turn. First, although Mother agrees in her brief that "courts may look to parental conduct occurring both before and after the child's birth," she then focuses on the fact that "because she never left the hospital with [Aaron] after birth," he experienced no direct exposure to endangerment while he was in her care. The jury, however, could have based its endangering-conduct finding on Mother's prior CPS history; her

failure to show for five requested drug tests, which were presumed positive[23] and were required under her service plan;[24] her public intoxication on two occasions when the police were called; her failure to follow instructions on thickening the liquid in Aaron's bottles; her failure to visit Aaron on a regular basis and her virtual absence during the two months that he was in the hospital; her failure to maintain safe and stable housing; and her failure to detach herself from Steve, who inflicted domestic violence on her on numerous occasions.

Mother's second argument is that she did not know that she was pregnant with Aaron when she smoked marijuana, that she stopped smoking marijuana after she found out that she was pregnant, and that only one positive drug test was admitted at trial. Mother's second argument ignores that she failed to show up for five drug tests,

---

[23]Mother argues in her brief that "[t]he fact that a [p]arent tests positive for marijuana alone is not grounds even for a removal." As shown throughout the analysis that follows, marijuana use was not the only concern with which the jury was presented. *See In re A.V.*, No. 23-0420, 2024 WL 3996105, at *1 (Tex. Aug. 30, 2024) (reiterating prior supreme court precedent that a reviewing court should not evaluate drug-use evidence in isolation). Moreover, although Mother contends that no evidence was presented that her use of marijuana caused significant impairment to Aaron's physical or mental health or emotional development (i.e., there was no causal link between her drug use and the alleged endangerment), the issue is whether Mother engaged in conduct that endangered Aaron's well-being, not whether she caused him actual harm. *See R.R.A.*, 687 S.W.3d at 277–78.

[24]*See In re D.D.*, No. 02-17-00368-CV, 2018 WL 1630708, at *8 (Tex. App.— Fort Worth Apr. 5, 2018, no pet.) (mem. op.) (holding evidence legally and factually sufficient to support the Subsection (O) finding because mother did not comply with drug-testing requirements and had some presumed positive results due to failing to submit to some requested drug tests).

which were presumed positive for illegal drugs.[25] Mother's past behavior is indicative of her future behavior, and there is no evidence that Mother has eliminated the Department's concerns over her drug use.

Mother complains in her third argument that although the Department expressed concerns about her and her previous CPS history, the original conservatorship worker was assigned to the case for only a month and a half, and the investigator who testified never personally observed Mother with Aaron at the hospital or talked to the doctors.[26] Mother's argument implies that the Department is not allowed to rely on records from within the Department or from a hospital, but she cites no authority for this. Mother simultaneously relies on such documents when asserting that the investigator, who relied on the initial conservatorship worker's affidavit, testified that Mother was generally appropriate when she visited Aaron at the hospital. Mother further argues that there was no safety plan in place in this case preventing her from being around Steve and that she had previously successfully completed a Family-Based Safety Services program in 2013 after a previous child of hers had tested positive for marijuana. None of the arguments that Mother presents prevented the jury from considering her prior CPS history and the medical records

[25]Drug tests test for illegal substances other than marijuana, including amphetamines, cocaine, methamphetamine, opiates, oxycodone, and phencyclidine (PCP).

[26]The investigator testified because the initial conservatorship worker was no longer with the Department.

30

that were admitted into evidence and drawing their own conclusions as to her conduct.

In her fourth argument, Mother contends that the hospital staff did not voice their concerns to her about Steve's domineering behavior or ask if she needed help getting away from him. This argument is not persuasive. The evidence showed that Mother knew that Steve was a "bad person," that she had been on the receiving end of his violent nature on multiple occasions, and that police officers and others offered to assist her with obtaining a protective order but that she never followed through.

Mother's fifth argument centers on her mental capacity, arguing that "mental health issues alone are not enough" to support the endangering-conduct finding. Mother's low intellectual functioning, however, was not the only evidence of endangering conduct that the jury received. As set forth above, the jury had multiple types of endangering conduct—drug use, intoxication, prior CPS history, and domestic violence—on which to base their decision.

Applying the standards of review set forth above, we hold that the evidence is legally and factually sufficient to support the endangering-conduct finding. *See* Tex. Fam. Code Ann. § 161.001(b)(1)(E); *In re A.R.F.*, No. 02-13-00086-CV, 2013 WL 3874769, at *16–20 (Tex. App.—Fort Worth July 25, 2013, no pet.) (mem. op.) (holding evidence legally and factually sufficient to support endangering-conduct

finding under (E) because father had, among other things, prior CPS history and had tested positive for drugs). We overrule Mother's third issue.[27]

## C. Best-Interest Finding

In her sixth issue, Mother argues that the evidence is "legally or factually" insufficient to support the best-interest finding. After applying the best-interest factors, as set forth below, we conclude that the finding is supported by legally and factually sufficient evidence.

### 1. The Law on Best Interest

Although we generally presume that keeping a child with a parent is in the child's best interest, *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006), the best-interest analysis is child-centered, focusing on the child's well-being, safety, and development, *In re A.C.*, 560 S.W.3d 624, 631 (Tex. 2018). In determining whether evidence is sufficient to support a best-interest finding, we review the entire record. *In re E.C.R.*, 402 S.W.3d 239, 250 (Tex. 2013). Evidence probative of a child's best interest may be the same evidence that is probative of a Subsection (b)(1) ground. *Id.* at 249; *C.H.*, 89 S.W.3d at 28; *see* Tex. Fam. Code Ann. § 161.001(b)(1), (2). We also consider the

---

[27]Because only one predicate ground is necessary to affirm termination, we need not address Mother's second, fourth, and fifth issues, which challenge the sufficiency of the evidence to support the jury's findings under Subsection (D)—endangering environment—and Subsection (O)—failure to complete her service plan. *See* Tex. R. App. P. 47.1; *In re H.C.*, No. 02-23-00477-CV, 2024 WL 1561513, at *4 (Tex. App.—Fort Worth Apr. 11, 2024, no pet.) (mem. op.).

evidence in light of nonexclusive factors that the factfinder may apply in determining

the child's best interest:

(A)     the [child's] desires . . . ;

(B)     the [child's] emotional and physical needs[,] . . . now and in the
        future;

(C)     the emotional and physical danger to the child now and in the
        future;

(D)     the parental abilities of the individuals seeking custody;

(E)     the programs available to assist these individuals to promote the
        [child's] best interest . . . ;

(F)     the plans for the child by these individuals or[, if applicable,] by
        the agency seeking custody;

(G)     the stability of the home or proposed placement;

(H)     the [parent's] acts or omissions . . . indicat[ing] that the existing
        parent–child relationship is not a proper one; and

(I)     any excuse for the [parent's] acts or omissions.

*Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976) (citations omitted); *see E.C.R.*,

402 S.W.3d at 249 (stating that in reviewing a best-interest finding, "we consider,

among other evidence, the *Holley* factors" (footnote omitted)); *In re E.N.C.*, 384

S.W.3d 796, 807 (Tex. 2012). These factors are not exhaustive, and some listed

factors may not apply to some cases. *C.H.*, 89 S.W.3d at 27. Furthermore,

undisputed evidence of just one factor may be sufficient to support a finding that

termination is in the child's best interest. *Id.* On the other hand, the presence of

scant evidence relevant to each factor will not support such a finding. *Id.*

## 2. Analysis

### a. Aaron's Desires

Aaron was too young at the time of the trial to communicate his desires. This factor would normally be neutral, *see In re C.W.*, No. 02-23-00414-CV, 2024 WL 637264, at *9 (Tex. App.—Fort Worth Feb. 15, 2024, pet. denied) (mem. op.), but when the evidence also shows that, as in this case, a child has bonded with his foster parents and has spent minimal time with his parent, this factor can weigh in favor of termination, *see In re J.D.*, 436 S.W.3d 105, 118 (Tex. App.—Houston [14th Dist.] 2014, no pet.) ("When children are too young to express their desires, the [factfinder] may consider that the children have bonded with the foster family, are well[ ]cared for by them, and have spent minimal time with a parent."). Because the evidence shows that Aaron has bonded with his foster parents, that Mother spent little time with Aaron during his first two months of life, and that she was not truly present with him during the weekly visits but instead was on her phone during the visits that she attended, this factor weighs slightly in favor of termination.

### b. Aaron's Emotional and Physical Needs

The evidence shows that Aaron was receiving multiple types of therapy to support his physical needs. Mother had a meeting with her conservatorship worker on April 8, 2024, to go over Aaron's needs, but at the trial approximately two weeks later, Mother could not remember his specific needs and was not sure what therapies he was receiving. Moreover, Mother had demonstrated an inability to meet Aaron's

34

physical needs during his hospital stay and during the visits, especially when it came to adding the required thickener to his bottles and allowing him to practice his mobility. Mother also failed to connect with Aaron during the visits and instead focused her attention on her phone. Furthermore, Mother's psychologist had concerns about Mother's ability to adequately parent Aaron. Because the evidence shows that Mother is unable to provide for Aaron's present and future emotional and physical needs, this factor weighs in favor of termination.

### c. Danger to Aaron

With regard to the emotional and physical danger to Aaron, during the pendency of the case, Mother had one positive drug test and five presumed positive tests, had changed addresses frequently, and had not detached herself from Steve, who had a history of intoxication and domestic violence. Multiple people testified that it would not be safe for a child to be around Steve and that Mother had shown that she could not protect herself, much less anyone else, from him. Mother herself agreed during the trial that no one was going to be able to trust that she would keep Aaron safe because she had not demonstrated that throughout the case. Additionally, Mother's inability to remember to add thickener to Aaron's bottles posed an ongoing danger to him because such failures caused him to vomit and risked causing him to aspirate. This factor weighs in favor of termination.

### d. Parenting Abilities, Plans for Aaron, Stability of Proposed Home, and Available Programs

Mother was offered a parenting coach to help during her visits, but she turned down the offer because she felt like "[i]t would just come to [her] because [she's] his mother." The evidence, however, demonstrated that such wisdom did not "just come to [her]"; instead, she struggled to meet Aaron's basic needs during visits. Mother agreed that she had not taken advantage of the Department's help, even when people had reached out to her, and thus she did not put herself in a position to provide a safe, stable home for Aaron. Although Mother asked the jury to give Aaron back to her, the Department and CASA volunteer urged termination of Mother's parental rights so that he could be adopted by his foster parents. The foster parents had provided a safe and stable home for Aaron ever since he was discharged from the hospital and had been able to meet his needs in the hospital and after his discharge—including taking advantage of the ECI program and making sure he received the therapies that he needed. These factors weigh in favor of termination.

### e. Acts and Omissions Suggesting Improper Relationship

The evidence demonstrated that Mother had used drugs while pregnant with Aaron and had failed to exhibit sobriety (via negative tests) during the case.[28] In addition to one positive drug test after Aaron was removed and five presumed-

---

[28]In her brief, Mother contends that she "completed her services," but she ignores that she failed to submit to random drug testing and to refrain from alcohol use.

positive tests, Mother was found to be intoxicated on two occasions when the police were called. Before and after Aaron's birth, Mother was repeatedly abused by Steve, and his daughter also attacked her. Although Mother claimed that she would choose Aaron over Steve, her actions showed otherwise—Steve drove her to visits and moved her into her new home right before the termination trial. And Mother failed to make proper bottles to meet Aaron's physical needs. This factor weighs in favor of termination.

### f. Excuses

During the trial and on appeal, Mother contended that no one at the hospital informed her of concerns about Steve's domineering nature or offered to help her. In her brief, Mother states that she struggles to read; that she did not understand her services; that her first lawyer did not explain them to her; that the Department was not clear about why they were asking her about drug testing; and that based on the Department's discussions with her about Steve, she "just thought she couldn't be in a romantic relationship" with him. The jury was allowed to weigh the sincerity and reasonableness of Mother's excuses and to determine whether they sufficed as justification for her acts and omissions. *See C.W.*, 2024 WL 637264, at *13 (citing *In re J.S.H.*, No. 04-23-00078-CV, 2023 WL 4610052, at *8 (Tex. App.—San Antonio July 19, 2023, pet. denied) (mem. op.)). This factor also weighs in favor of the trial court's best-interest finding.

### g. Sufficient Evidence of Best-Interest Factors

Applying the appropriate standards of review, we hold that the evidence is legally and factually sufficient to support the finding that termination of Mother's parental rights to Aaron was in his best interest. *See* Tex. Fam. Code Ann. § 161.001(b)(2); *In re A.V.*, No. 11-23-00144-CV, 2023 WL 8631492, at *8 (Tex. App.—Eastland Dec. 14, 2023, no pet.) (mem. op.) (holding evidence legally and factually sufficient to support the best-interest finding based on, among other things, mother's lack of parental abilities, history of domestic violence and drug abuse, her inability to provide a safe and stable environment, and the lack of justification for her misconduct); *Jordan v. Dossey*, 325 S.W.3d 700, 733 (Tex. App.—Houston [1st Dist.] 2010, pet. denied) (holding evidence legally and factually sufficient to support the best-interest finding when most of the best-interest factors weighed in favor of termination). We overrule Mother's sixth issue.

## V. Conclusion

Having overruled Mother's first, third, and sixth issues, which are dispositive of her appeal, we affirm the trial court's order terminating Mother's parental rights to Aaron.

/s/ Dabney Bassel

Dabney Bassel
Justice

Delivered: September 12, 2024

38